**Joanne OUELLETTE, Plaintiff,**

v.

**UNION TANK CAR COMPANY, John Doe Company and Consolidated Rail Corporation, Defendants.**

**Civ. A. No. 93–30227–MAP.**

United States District Court, D. Massachusetts.

Oct. 27, 1995.

Michael T. Sarnacki, Chartier, Ogan, Brady & Lukakis, Holyoke, MA, Samuel A. Marsella, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, for Plaintiff Joanne Ouellette.

Charles K. Bergin, Jr., Robinson, Donovan, Madden & Barry, Springfield, MA, William N. Erickson, Robins, Kaplan, Miller & Ciresi, Boston, MA, for Defendant Union Tank Car Company.

Judith Buckley Hayman, Leonard F. Zandrow, Robert L. Farrell, Kevin J. O'Leary, Parker, Coulter, Daley & White, Boston, MA, for Defendant Consolidated Rail Corporation.

Kevin C. Maynard, Bulkley, Richardson & Gelinas, Springfield, MA, for Third–Party Defendant Monsanto Company.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

PONSOR, District Judge.

### I. INTRODUCTION

Before the court are plaintiff Joanne Ouellette and defendant Union Tank Company's ("UTC") objections to Magistrate Judge Kenneth P. Neiman's Report and Recommendation regarding the motions for summary judgment of defendant Consolidated Rail Corporation ("Conrail") and defendant UTC. In the Report and Recommendation, the Magistrate Judge recommended granting Conrail's motion for summary judgment and denying UTC's motion for summary judgment. For the reasons which follow, this court will adopt the portion of the Report and Recommendation recommending sum-

mary judgment in favor of defendant Conrail. The court will, however, decline to adopt the recommendation with regard to UTC's motion and will grant summary judgment as to defendant UTC, based on the August 14, 1995 decision in *Talbott v. C.R. Bard, Inc.*, 63 F.3d 25 (1st Cir.1995).

## II. FACTUAL AND PROCEDURAL BACKGROUND

The factual background, which is not disputed by the parties, was determined by the Magistrate Judge to be as follows:

Plaintiff brought claims against UTC alleging negligence, failure to warn and breach of warranty. Plaintiff alleged that UTC provided inadequate safety appliances on a tank car that UTC had manufactured and leased to Plaintiff's employer, Monsanto Chemical Corporation ("Monsanto"). Conrail was a rail carrier that delivered the tank car to Monsanto's plant. Plaintiff also asserted claims against Conrail for negligence, failure to warn, and breach of warranty. Plaintiff commenced her action in the Massachusetts Superior Court, Hampden County, but the case was removed to this Court in October of 1993 based on diversity of citizenship and the amount in controversy. 28 U.S.C. § 1332(a)(1).

The facts of the accident at issue are as follows: On August 13, 1990, Plaintiff was an employee of Monsanto at its Indian Orchard facility in Springfield, Massachusetts. Plaintiff was a material handler for Monsanto and one of her tasks required her to ascend and descend tank cars. While on the tank cars, Plaintiff has to set and release the brake, as well as uncouple cars for loading and unloading. On the day of her accident, Plaintiff ascended a tank car (designated UTLX 85130) in order to release a brake so that the tank car could be uncoupled. Once on the tank car's walkplate, Plaintiff disengaged the brake, turned around and walked back to the vertical handhold and ladder. Plaintiff began to descend the tank car, holding the side handhold, and attempted to turn her body around to step down to the sill step. She lost her grip and fell to the ground, sustaining injuries to her leg. Plaintiff alleges that her fall was a result of an ill-placed handhold and claims that a side railing would have been a safer and preferable feature.

The car designated UTLX 85130 is classified as a 10,000–gallon tank car with side platforms. This UTLX-style tank car was required to have a vertical handhold located on the belly of the tank, rather than a side railing along the end of the car's walkplate. All UTLX tank cars of this class were of the same design. The size and location of the tank cars' safety appliances are governed by federal law. Before modifications can occur, designs and blueprints must first be submitted and approved by the Tank Car Committee of the Association of American Railroads ("AAR").

When the UTLX 85130 tank car was originally built in 1965, the design of the safety appliances, including the handhold designs, was governed by the 1950 edition of the United States Safety Appliance Act. 45 U.S.C. § 1 *et seq.* The portion of the Act entitled "Tank Cars with Side Platforms" sets forth the dimensions, location, and manner of application of the side handhold for tank cars with side platforms. In 1970, the Secretary of Transportation promulgated regulations governing handholds pursuant to the Federal Railroad Safety Act, 45 U.S.C. § 4.[1] The regulations are identical to the provision in the Safety Appliance Act, providing in specific detail the location, size, and number of handholds. 49 CFR § 231.7 (1989 edition).[2]

---

1. Section 4, entitled "Grab irons or handholds for security in coupling and uncoupling cars," provides as follows:

 Until otherwise ordered by the Secretary of Transportation, it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grab irons or handholds in the ends and sides of each car for greater security to [people] in coupling and uncoupling cars.

2. 49 CFR § 231.7 provides as follows:
 (c) *Side handhold*—(1) *Number.* Four or more. (2) *Dimensions.* Same as specified for "Box and other house cars." (See 231.1(H)(2)). (3) *Location.* (i) Horizontal, one on face of each side sill near each end. Clear-

The subject tank car was manufactured and owned by UTC through the date of the accident. The tank car was delivered to Monsanto by Conrail on August 8, 1990, five days prior to Plaintiff's fall. Plaintiff's claims against Conrail arise solely from the fact that Conrail delivered the tank car to Monsanto. Monsanto leased the tank car from UTC from 1981 through February of 1993. Conrail had no role in the design, manufacture, marketing or merchandising of the subject tank car.

Monsanto's practice at the time of the accident was to require an inspection of every rail car prior to entry into its plant. Rail cars had to comply with the applicable federal regulations, the rules of the Association of American Railroads ("AAR Interchange Rules"), and Monsanto's Logistics, Distribution and Shipping guide ("LDS guide"). If a car was not in compliance with any of the regulations, it was not allowed into the Monsanto plant until the defective condition was repaired.

Monsanto contracted with the Carl Fisher Company ("Fisher") to perform all of its rail car inspections and minor repairs. Monsanto also required Fisher to conduct annual inspections on Monsanto's leased and owned rail cars. Fisher had inspected tank car UTLX 85130 numerous times prior to Plaintiff's accident and found upon each inspection that it complied with federal safety regulations concerning the requisite safety devices, including the regulations governing handrails, ladders and platforms. The tank car also passed the more thorough annual inspection performed by Fisher in April, 1990, four months prior to the Plaintiff's accident.

When the subject tank car was delivered to Monsanto by Conrail on August 8, 1990, it passed Monsanto's inspection and was allowed into the plant. Earlier, the tank car had passed inspection when Conrail inspected it in Conrail's yard. Employees of both Fisher and Monsanto inspected and passed the tank car within a day or two of the Plaintiff's accident. The tank car similarly passed an annual inspection in April of 1991, after the Plaintiff's accident.

Report and Recommendation at 2–5.

## III. *STANDARDS OF REVIEW*

### A. *De Novo Review*

■ A dissatisfied litigant may obtain review of a report and recommendation regarding a dispositive motion issued by a magistrate judge by filing an objection to the report and recommendation in the district court. The district court applies a *de novo* standard of review, which does not require a new hearing. Rules for United States Magistrates in the United States District Court for the District of Massachusetts 3(b); *see also Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The court may accept, reject or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions. *See Paterson–Leitch v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–991 (1st Cir.1988) (*citing* Fed.R.Civ.P. 72); *see also* 28 U.S.C. § 636(b)(1)(B).

### B. *Summary Judgment*

Summary judgment is proper under Fed. R.Civ.P. 56(c) when the "pleadings and the affidavits raise no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." *Mendes v. Medtronic, Inc.,* 18 F.3d 13, 15 (1st Cir.1994). "The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of material fact." *Id., citing Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In this setting, " 'genuine' means that 'the evidence is such that a reasonable

ance of outer end of handhold shall be not more than 12 inches from end of car. (ii) If side safety railings are attached to tank or tank bands, four additional vertical handholds shall be applied, one as nearly as possible to each sill step and securely fastened to tank or tankband.

The Court uses the 1989 edition of 49 CFR § 231.7 because it was in effect at the time of Plaintiff's accident. This section has not changed with respect to side handholds on a tank car with side platforms. The 1950 standards are identical to the standards set forth in the 1989 revised edition of 49 CFR § 231.7.

jury could return a verdict for the non-moving party,' and a material fact is one which 'might affect the outcome of the suit under the governing law.'" *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993), *citing Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Additionally, "[m]ere allegations or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." *August v. Offices Unlimited, Inc.,* 981 F.2d 576, 580 (1st Cir.1992). Finally, questions of law are appropriate for resolution on summary judgment, barring a genuine dispute of material fact. *Jimenez v. Peninsular & Oriental Steam Navigation Co.,* 974 F.2d 221 (1st Cir.1992).

## IV. *DISCUSSION*

Both plaintiff's and defendant UTC's objections to the Report and Recommendation hinge on what effect UTC's alleged noncompliance with federal regulations has on the preemption provisions of the Federal Railroad Safety Act of 1970 ("FRSA"). 45 U.S.C. §§ 421 *et seq.* The short answer is none. All plaintiff's claims against UTC are preempted regardless of whether the placement of the handrail was in compliance with the federal regulations. Given this, UTC's motion for summary judgment must as a matter of law be granted on all counts.

### A. *Preemption*

 The Supremacy Clause of the United States Constitution provides that a state statute must yield to a federal statute with which it conflicts. *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 1732, ——, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993), *citing* U.S. Const., Art. VI., cl. 2.[3] When a federal statute contains an express preemption clause, as it does here, the court must focus on the plain wording of the clause, since it contains the best evidence of the scope of Congress' preemptive intent. 507 U.S. at ——, 113 S.Ct at 1737.

**3.** This clause states:
This Constitution and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United

 The Federal Railroad Safety Act specifically provides that a state may adopt or continue in force any law or standard relating to railroad safety but only "until such time as the Secretary [of Transportation] has adopted a rule, regulation, order or standard covering the subject matter of such State requirement." 45 U.S.C. § 434. Any additional or more stringent standard may be adopted by a state only "when necessary to eliminate or reduce an essentially local safety hazard ..." *Id.* State common law legal duties, to the extent they are imposed on railroads, fall within the scope of these preemption provisions. *CSX Transportation,* 113 S.Ct. at 1737–38, *citing Cipollone v. Liggett Group, Inc.* 505 U.S. 504, 521, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407 (1992).

The Supreme Court has articulated the standard of proof required to prevail on an FRSA preemption claim:

> To prevail on the claim that the regulations have preemptive effect, petitioner must establish more than that they "touch upon" or "relate to" that subject matter, for "covering" is a more restrictive term which indicates that preemption will lie only if the federal regulations *substantially subsume* the subject matter of the relevant state law.

*CSX Transportation v. Easterwood,* 507 U.S. at ——, 113 S.Ct at 1738 (citations omitted) (emphasis added).

In *CSX Transportation,* the Supreme Court, relying on federal regulations that set the maximum allowable operating speeds for all freight and passenger trains held that those regulations preempt any common law claim of negligence with respect to the train's operating speed. The Court also rejected plaintiff's argument that the savings clause of § 434 permitted the state to preserve its common-law speed restrictions as an essentially local safety matter:

> The state law on which [plaintiff] relies is concerned with local hazards only in the sense that its application turns on the facts

States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

of each case. The common law of negligence provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions. [Plaintiff's] contrary view would completely deprive the Secretary of the power to preempt state common law, a power clearly conferred by § 434.

507 U.S. at ——, 113 S.Ct. at 1743.

The pending action contains state common-law claims of negligence, product liability, failure to warn and breach of warranty, all of which directly conflict with the federal safety regulation in issue. 49 C.F.R. § 231.7.[4] Section 231.7 governs handholds on rail tank cars with side platforms. It mandates the number and size of handrails, in addition to providing a location for the placement of such devices. As such, the federal regulation *substantially subsumes* the subject matter of the design and placement of the handrail on the tank car, leaving no room for a private action based upon state law theories.

While federal preemption often means that there is no remedy available to a claimant, in many instances unfortunately this result is necessary to vindicate the intent of Congress. *See Smith Dunham–Bush, Inc.*, 959 F.2d 6, 11 (2d Cir.1992). By pervasively legislating the field of railroad safety, Congress demonstrated its intent to create uniform national standards and to preempt state regulation of railroads. *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108, 1112–1113 (5th Cir. 1973), *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973), *interpreting* 45 U.S.C. § 434. If state common law tort claims were permitted to proceed despite this Congressional intent, on the ground that the purported tortfeasor had in some way allegedly failed to comply with the federal standards, then manufacturers would inevitably be subjected to varying interpretations of the federal regulations in the different states. *See Talbott v. C.R. Bard*, 63 F.3d 25 (1st Cir. 1995) (Medical Devices Act preemption). Inevitably, these tort actions would generate precisely those inconsistencies in railroad safety standards that Congressional action was intended to avoid.

In *Talbott*, the First Circuit held that Congress did not intend to provide for an exception to the MDA preemption clause when a manufacturer did not comply with a federal standard. 63 F.3d at 28. The Court of Appeals began its analysis of the MDA by noting that there was no special statutory language covering a device that was not in compliance with federal regulations. 63 F.3d at 29 ("Section 360k(a) does not mention compliance at all"). Further, the court noted that if a manufacturer failed to meet the federal requirements, it would be subject to the federal penalties as set forth under the MDA. *Id.* The court noted that inquiry into compliance in order to allow state tort claims could subject a device manufacturer to inconsistent interpretations and applications of the MDA across the different states, thus undermining the MDA's goal of uniformity. *Id.* Finally, the court decided that Congress placed the enforcement authority for the statute with the Food and Drug Administration and that the agency had the broad power to determine whether the provisions of the MDA had been violated and to apply the law in a uniform manner. 63 F.3d at 29–30. Given all this, the court did not find any exception to preemption *even when* the manufacturer failed to comply with federal regulations.

This reasoning extends to the Federal Railroad Safety Act. Like the MDA, the FRSA's preemption language also does not differentiate between instances where a manufacturer has complied with a federal regulation and where it has not. 45 U.S.C. § 434. Furthermore, similar to the MDA, the FRSA expressly offers injunctive relief and provides penalties for violations. 45 U.S.C. §§ 438, 439. While these penalty provisions call for Attorney General enforcement action, allowing only minimal per diem sanctions for violations, and do not allow for a private right of action, they do show Congressional intent to regulate the field of railroad safety under one comprehensive statute.

As the Secretary of Transportation has specifically addressed the safe design and placement of handholds on tank cars, to permit the plaintiff's claim would "completely

---

4. *See* n. 2, *supra.*

deprive the Secretary of the power to pre-empt state common law, a power clearly conferred by § 434." 507 U.S. at ——, 113 S.Ct at 1743. Given the language of the FRSA, the court must conclude that Congress never intended to give individuals a private right of action to obtain damages for noncompliance with the federal regulations. *See* 474 F.2d at 1111–13.

In support of her opposing position, the plaintiff cites a lone 1979 decision by the Illinois Supreme Court, which holds that "federal law" does not preempt a state product liability claim for designing a faulty rail car. *Rucker v. Norfolk & Western Railway Company*, 77 Ill.2d 434, 33 Ill.Dec. 145, 396 N.E.2d 534 (1979). However, this holding does not specifically discuss the preemption provisions of the Federal Railway Safety Act and only briefly refers to the Safety Appliances Act, both of which shape the preemption determination here.

No other case permits such a claim against the highly regulated railroad industry. The existing railroad cases mainly deal with speed, which is always preempted, or with purely "local hazards," which the narrow FRSA preemption savings clause gives back to the state. 507 U.S. at ——, 113 S.Ct at 1743. *See also Williams v. Burlington N. R. Co.*, 849 F.Supp. 682 (E.D.Ark.1994) (specific regulations adopted pursuant to FRSA preempted common law negligence claim relating to train speed), *Stanford v. Burlington N. R. Co.*, 845 F.Supp. 397 (N.D.Miss.1994) (claim of train travelling at excessive speed preempted by specific federal regulations), *Bowman v. Norfolk Southern Ry. Co.*, 832 F.Supp. 1014 (D.S.C.1993) (claims preempted as "local hazards" cannot be statewide in character).

For the above reasons, plaintiff's claims create an impermissible conflict with the federal statute and are preempted. As there no longer remains a genuine issue of material fact regarding compliance, summary judgment will be entered in favor of UTC as a matter of law based on the preemption of all of plaintiff's claims.[5]

5. Due to the preemption of plaintiff's claims, there no longer exists a material dispute of fact between the two parties. As such, the qualifica-

## V. CONCLUSION

For the reasons listed above, the court hereby ADOPTS the Magistrate Judge's Report and Recommendation, in part. Defendant Conrail and defendant UTC's separate motions for summary judgment are both ALLOWED. The cross-claims between Conrail and UTC and the third-party action against Monsanto Company are dismissed without prejudice.

Plaintiff will have twenty (20) days from the date of this memorandum to move to amend her complaint to name the remaining "John Doe" defendant corporation. If this is not done, the claims against this entity will also be dismissed and judgment will enter for all defendants.

A separate order will issue.

tions of the expert witness, Michael P. Massie, need not be addressed.